# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

**DARYLL D. LONG,**

    **Plaintiff,**

**vs.**　　　　　　　　　　　　　　　　　　　　**CASE NO.: 3:05cv227 MCR/EMT**

**ELLIS ENVIRONMENTAL GROUP, LC,**

    **Defendant.**
_____/

## ORDER ON MOTION FOR SUMMARY JUDGMENT

This case, which is brought pursuant to the Uniformed Services Employment and Reemployment Rights Act (38 U.S.C. §§ 4301 et seq.) ("USERRA"), stems from a dispute between plaintiff Daryll D. Long ("Long") and defendant Ellis Environmental Group, LC, ("Ellis"). Pending is Ellis' motion for summary judgment, to which Long has responded. For the reasons that follow, the court GRANTS Ellis' motion and directs entry of final judgment in Ellis' favor.

## Background

The following facts are recited in the light most favorable to Long or, except as noted, are undisputed.[1] Long began his employment with Ellis in February 2000 as a

---

[1] At summary judgment this court must view the facts in the light most favorable to the nonmoving party. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The court therefore does so here, drawing those facts from the pleadings, depositions, and other evidentiary materials on file. Nevertheless, the court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts. See Montount v. Carr, 114 F.3d 181, 182 (11th Cir. 1997).

Project Manager with an initial salary of $68,000. In October 2000 Long's salary was increased to $75,000; in April 2001 it was further increased to $100,000. In October 2001 Long was promoted to Vice President of Construction, and in August 2002 his salary was increased to $112,000. As Vice President of Construction, Long was responsible for the execution of the company's construction projects as well as for customer satisfaction and hiring decisions for these projects.[2] In this position Long reported directly to Ellis' Senior Vice President of Operations, James Bleke, Jr. Long also supervised the work of various subordinates, including Regional Managers Jim Beights and Clay Gibson.[3]

During the time he worked for Ellis, Long also served as an officer in the United States Naval Reserve. In July 2004 Long received orders for military deployment to the Middle East. In response to Long's notice to Ellis of his deployment, James Bleke sent Long a letter acknowledging Long's active military duty leave of absence. The letter also noted that, under USSERA, upon Long's return from active duty he would be reemployed at the same seniority and with the same benefits. In addition, the letter stated that Long could elect to maintain "COBRA-like" health care coverage. Ellis also pledged to pay Long $2,000 per month as a retainer during his deployment, in appreciation of his prior service to the company.[4]

Long reported for active duty on August 12, 2004, and spent six months deployed in Iraq.[5] During this time, Long was attached to the Marine Expeditionary Force Engineer Group. He served as the officer in charge of construction contracts, provided engineering assessments, and developed and negotiated contracts with local Iraqis. Long also supported the Marines' civil affairs groups on engineering missions working to build and

---

[2] Long supervised construction projects for Ellis in Pensacola, Florida; Jacksonville, Florida; Albany, Georgia; and Meridian, Mississippi.

[3] Jim Beights served as Regional Manager for Jacksonville projects while Clay Gibson was Regional Manager of Pensacola projects and assisted Long in managing Ellis' Pensacola office.

[4] The total compensation Long received during his deployment was $16,000.

[5] Before leaving Ellis for pre-deployment training, Long demoted Jim Beights from Regional Manager to Field Superintendent, with a commensurate reduction in salary from $100,000 to between $70,000 and $80,000.

renovate schools, hospitals, border forts, police stations, and mosques.

At the time Long left Ellis for his deployment, the company was not doing well financially. Rather than hire a new or interim Vice President of Construction, Ellis delegated Long's former duties to Jim Beights and Clay Gibson, with assistance from Jeffrey Bleke (Ellis' president) and James Bleke. The company's financial problems reversed in November 2004 when it was awarded a $10 million "blue roof" contract to help in the recovery after Hurricane Ivan. The company also became qualified as a federal contractor, allowing it to bid on construction work under the United States Air Force's Worldwide Environmental Renovation and Construction ("WERC") contract.[6] In addition, Ellis obtained part of a $220-$380 million Multiple Award Task Order ("MAC") contract with the United States Navy. As a result of the increased workload from these contracts, in February of 2005 Jim Beights was promoted to Vice President of Construction with larger responsibilities and an increase in salary to $100,000.

Throughout Long's deployment company executives remained in contact with him, keeping him abreast of the changes and growth the company was experiencing. One email sent on February 15, 2005, notified Long of Jim Beights' promotion to Vice President of Construction.[7] On the same day, Jeffrey Bleke emailed Long to express his hope that Long would return to Ellis and mentioned that one of the possible positions Long might be offered on his return was head of the company's Air Force Programs. Bleke characterized the position as one of equal if not higher status in the company than was his former position and noted that the position potentially offered Long the opportunity to double or triple his base salary through performance-based incentives. Two days later Long responded to Jeffrey Bleke's email and stated his desire to return to the company in a position where he could be "rewarded professionally and financially." Long further stated that he looked forward to discussing his reemployment with respect to "his previous

---

[6] The WERC contract was between $7.5 and $10 billion. As a qualified federal contractor Ellis was entitled to apply for parts of the overall contract. As of April 2006 Ellis had received $77 million in WERC contracts.

[7] This email was sent approximately two months before Long returned from his deployment.

position or one of equal or higher level" and that he was "always ready to assume greater levels of responsibility." He made no mention of the news of Jim Beight's promotion to Vice President of Construction.

Long returned from his deployment in April 2005 and had several phone conversations with company executives. During one conversation James Bleke[8] informed Long that Jeffrey Bleke and Ellis' Chief Executive Officer, Rusi Charna ("Charna"), had met with representatives of another company, Fluor International ("Fluor"), about possibly selling Ellis' Air Force contracts. Bleke told Long that Long had been recommended to Fluor to manage the contracts if the deal went through because of his experience in Iraq.[9] Long then stated to Bleke that it looked as if Ellis did not want him back, to which statement Bleke did not respond. Long also set up a meeting with the Blekes and Charna for April 26, 2005, to discuss his reemployment.

On April 20, 2005, in preparation for the April 26th meeting, Ellis sent Long a reemployment offer letter, which Long received a few days before the meeting. The letter offered to reemploy Long as Senior Vice President of Air Force Programs. This was a new position at Ellis created as part of the company's attempt to secure more contracts with the Air Force. The duties of the position had previously been performed by Jeffrey Bleke and Michael Carter.[10] The offer letter explained that the base salary for the new position would be $112,000, with an additional bonus of 0.25% of awarded Air Force contracts over $10 million that Long procured. The letter also stated that the position would be in San Antonio, Texas, and that Ellis would pay Long's expenses for relocating to San Antonio from Pensacola. In addition, as Senior Vice President, Long would report directly to Ellis' president, Jeffrey Bleke.

---

[8] By the time Long returned from his deployment James Bleke had been promoted from Senior Vice President of Operations to Executive Vice President.

[9] It appears from the record that this deal did not materialize.

[10] There is some dispute as to what position Michael Carter held. Long asserts that Carter was only a Program Manager. Charna stated in his deposition that Carter was a Program Manager and had never been Vice President of Air Force Programs. Jeffrey Bleke stated in his deposition that he was not sure if Carter had been a vice president or a senior vice president. In an email exchange between Carter and Long in April 2004, however, Carter's email signature stated that his position was Vice President of Federal Programs.

Upon receiving the letter Long concluded that the offered position violated his rights under USERRA. He contacted the Employer Support for Guard and Reserve to discuss his options and was referred to an ombudsmen, Ronald Hall ("Hall"). Hall contacted Ellis and attempted to mediate on Long's behalf. Ellis took the position that its offer letter to Long conformed to the requirements of USERRA; Hall conveyed this information to Long. Long also contacted James Bleke and was told that the Senior Vice President of Air Force Programs was the only position Ellis was offering to Long.

On April 26, 2005, Long met with the Blekes and Charna at Ellis' office in Newberry, Florida. The business aspect of the meeting lasted approximately three minutes. Long stated that he was not interested in the Senior Vice President of Air Force Programs position. Ellis offered to move the job to Pensacola, Florida, and to increase the salary but Long repeated that he was not interested in the position. Long turned in his cell phone and left. After the meeting Long called Hall again to discuss his options. Hall conducted a conference call with several of Ellis' officers to discuss Long's reemployment. Ellis maintained that Long had effectively resigned from his position, but nevertheless agreed to send Long another reemployment offer letter. Based on Hall's recommendations the second letter changed the location of the position to Pensacola, Florida, and changed the title to Vice President of Air Force Programs so that there would be no change in the level of employment. The letter also added a number of duties to the position's job description and stated that the position would allow Long to have "similar responsibilities" to those he had held before leaving for active duty. The letter was sent on April 26, 2005, with the request that Long respond by May 6, 2005. Long received the letter on April 28, 2005, but did not respond.

After making the offer to Long and receiving no response from him, Ellis did not fill the position of Vice President of Air Force Programs. Instead, Jeffrey Bleke continued to perform the duties associated with the position. Later in 2005, Ellis created Ellis World Alliance Corporation ("EWAC"), a separate entity with 50% common ownership. Ellis novated its WERC contracts to EWAC and provided those of its employees working on WERC contracts the option of becoming employees of EWAC. In November 2005 Jim

Beights left his position as Vice President of Construction to take a position with EWAC. Ellis interviewed a number of people to replace Beights as Vice President of Construction but ultimately decided not to fill the position.

In June 2005 Long initiated this suit. In his complaint Long alleges that Ellis discriminated against him for failing and refusing to reemploy him in the position he would have held but for his term of active duty or to a position of like seniority, status, and pay. As relief, Long seeks an award of back wages, front pay, liquidated damages for lost wages, benefits, and attorneys' fees and costs.

**Summary Judgment Standard**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "The mere existence of *some* alleged factual dispute between the parties," however, "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) (emphasis in original). A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. A fact is "material" if it may affect the outcome of the case under the applicable substantive law. See id.

When a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the adverse party may not rest on the mere allegations or denials of the moving party's pleadings. Instead, the nonmoving party must respond by affidavits or otherwise and present specific allegations showing that there is a genuine issue of disputed fact for trial. Fed. R. Civ. P. 56(e). When assessing the sufficiency of the evidence, the court must view all the evidence, and all factual inferences reasonably drawn therefrom, in the light most favorable to the nonmoving party. See Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993). Further, a reviewing court should not "make credibility determinations or weigh the evidence."

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S.Ct. 2097, 2110 (2000). A mere scintilla of evidence in support of the nonmoving party's position will not suffice to demonstrate a genuine issue of material fact and thereby preclude summary judgment. See Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990). If the adverse party fails to show a genuine issue of material fact, summary judgment, if appropriate, may be entered against the nonmoving party.

**Discussion**

The Uniformed Services Employment and Reemployment Rights Act was enacted to "prohibit employment discrimination on the basis of military service" and to provide "prompt reemployment" to individuals engaged in non-career military service. Coffman v. Chugach Support Servs., Inc., 411 F.3d 1231, 1234 (11th Cir. 2005) (citing 38 U.S.C. § 4301). Further, because the purpose of USERRA is "to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries." Hill v. Michelin N. Am., Inc., 252 F.3d 307, 312-13 (4th Cir. 2001). Section 4311 of USERRA "prohibits employers from discriminating against employees on the basis of military service." Id. Under § 4311, plaintiff bears the initial burden of showing by a preponderance of the evidence that (1) the defendant has denied him "initial employment, reemployment, retention in employment, promotion, or any other benefit of employment," and (2) plaintiff's military service was "'a substantial or motivating factor' in the adverse employment action." Sheehan v. Dep't of the Navy, 240 F.3d 1009, 1013 (Fed.Cir. 2001) (quoting National Labor Relations Bd. v. Transp. Mgmt. Corp., 462 U.S. 393, 400-01 (1983)). Once plaintiff has met his initial burden, the burden shifts to the employer to prove by a preponderance of the evidence the affirmative defense "'that legitimate reasons, standing alone, would have induced the employer to take the same adverse action.'" Id.; see also Coffman, 411 F.3d at 1239 (quoting Sheehan, 240 F.3d at 1014).[11] If established, this defense relieves the employer of liability even if prohibited discrimination was a factor

---

[11] Because this is an affirmative defense, the burden of production as well as the burden of persuasion shifts to the defendant once the plaintiff meets his initial burden under § 4311. Sheehan, 240 F.3d at 1014; accord Maxfield v. Cintas Corp. No. 2d, 427 F.3d 544, 551 (8th Cir. 2005).

in its decision. Sheehan, 240 F.3d at 1013. The defense applies to both "'dual motive' cases (in which the agency defends on the ground that, even if an invalid reason played a part in the adverse action, the same action would have been taken in the absence of the invalid reason) and so called 'pretext' cases (in which the agency defends on the ground that it acted only for a valid reason)." Id. (citing Holo-Krome Co. v. Nat'l Labor Relations Bd., 954 F.2d 108, 110-11 (2d Cir. 1992).

Section 4312 of USERRA provides reemployment rights to "'any person whose absence from a position of employment is necessitated by service in the uniformed services.'" Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 304 (4th Cir. 2006) (quoting Warren v. IBM, 358 F.Supp.2d 301, 310 (S.D.N.Y. 2005)). In order to invoke the right to reemployment, a returning service member must comply with the procedural requirements of § 4312.[12] Rogers v. City of San Antonio, 392 F.3d 758, 762-63 (5th Cir. 2004). Unlike § 4311, § 4312 does not require a showing of discriminatory intent. Coffman, 411 F.3d at 1235 (citing Wrigglesworth v. Brumbaugh, 121 F.Supp.2d 1126, 1134-35 (W.D. Mich. 2000)); accord Francis, 452 F.3d at 303 (citing 20 C.F.R. § 1002.33 (2006)).

Section 4313 details the manner in which the employer must reemploy the service member with respect to his or her position in the company. Id. at 763. Where a service member's period of service exceeded ninety days, the service member is entitled to reemployment in the position he would have held if his employment had not been interrupted, or "a position of like seniority, status and pay" as long as he is qualified for the position. 38 U.S.C. § 4313(a)(2)(A). This reemployment position is referred to as the "escalator" position as the service member does not return to the position he previously held but rather "'steps back on [the seniority escalator] at the precise point he would have occupied had he kept his position'" without interruption. Rogers, 392 F.3d at 763 (quoting

---

[12] Under 4312(a)(1), a service member must "give advance written or verbal notice of such service to such person's employer." Section 4312(e)(1) provides that a service member must notify his employer of his "intent to return to a position of employment with such employer . . . ." Pursuant to 4312(e)(1)(D), a service member must submit "an application for reemployment with the employer not later than 90 days after the completion of the period of service."

Fishgold v. Sullivan Drydock and Repair Corp., 328 U.S. 275, 284-85, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946)).[13]

In its motion for summary judgment Ellis contends that Long has failed to establish any issue of material fact and that Ellis is entitled to judgment as a matter of law, both as to any claim brought by Long pursuant to § 4311(a) or § 4312 of USERRA.[14] Long responds he has shown that genuine issues of material fact do exist regarding his claims, thus precluding entry of summary judgment in Ellis' favor.[15] The court proceeds by first discussing Long's claim under § 4312.

## A. Section 4312

As noted, in order to prove a claim under § 4312, plaintiff must show that he has fulfilled the procedural requirements of § 4312 and that the defendant's offered position violated the requirements of § 4313. In this case, the parties do not dispute that Long has complied with the procedural requirements of § 4312 and thus was entitled to reemployment. As Long's period of service exceeded ninety days, Ellis was required to reemploy Long into the escalator position or one of like seniority, status, and pay. Long argues that the escalator position he would have held was Vice President of Construction, whereas Ellis offered him the position of Vice President of Air Force Programs.[16] The

---

[13] The Fifth Circuit further noted that the escalator principle also applies to employment position, rate of pay, and seniority rights. Rogers, 392 F.3d at 763.

[14] Long's three-page complaint does not specify which provisions of USERRA he alleges Ellis violated. As in their memoranda the parties have addressed § 4311-4313, the court does likewise.

[15] Citing Reeves, supra, Long argues that any statements made by Ellis' officials or key employees and agents should not be considered except where they are offered against Ellis by Long. The Sixth Circuit rejected a similar argument, explaining that at summary judgment "defendants will often be able to respond only through the testimony of their employees." Stratienko v. Cordis Corp., 429 F.3d 592, 598 (6th Cir. 2005) (citation and quotation omitted). The Sixth Circuit also noted that the Supreme Court has recognized that the testimony of a moving party may be properly considered so long as it "is not contradicted by direct evidence, nor by any legitimate inferences from the evidence." Id. The court shall consider the evidence in this case in accordance with the view of the Sixth Circuit.

[16] The court will only discuss the offered position of Vice President of Air Force Programs rather than the first offered position of Senior Vice President of Air Force Programs, as the former position was the one that Long ultimately rejected. Nevertheless, the court notes that Ellis changed the title of the position, indeed apparently reduced the title, in an effort to satisfy Long's desire to be returned to a position with no change in level from his prior job.

Case No.: 3:05cv227/MCR/EMT

parties do not disagree that Ellis' offered position fulfilled the requirements of like seniority and pay.[17] The parties, however, disagree as to whether the offered position was of like status.

When considering the question of whether an offered position was of like status, courts are to afford the term "status" its ordinary and common meaning. United States v. Markey, 393 F.3d 1132, 1136 (10th Cir. 2004). Six factors should be evaluated in determining if an offered position for reemployment is of like status: (1) opportunities for advancement (2) general working conditions (3) job location (4) shift assignment (5) rank and (6) responsibility. 20 C.F.R. § 1002.194 (2006). In this case, application of these factors to the undisputed record evidence shows that the Vice President of Air Force Programs was of like status to the current Vice President of Construction or was of even higher status.[18]

The evidence reflects that the Vice President of Air Force Programs position would have had duties similar to those assigned to the Vice President of Construction position, but would have presented greater opportunities for advancement and greater corporate responsibility.[19] While the Vice President of Air Force Programs position was limited to only one large client, the duties were similar to those Long had performed as Vice President of Construction. Both positions required the supervision of regional and project managers at various construction sites. In both positions Long would have had responsibility for supervising construction projects and making sure that they were completed on time and on budget. Both positions also would have involved making personnel decisions and assuring customer satisfaction. Both positions further would have allowed Long to use his specialized skills as a professional engineer. Finally, while Long

---

[17] Long's pay as Vice President of Construction as performed by Jim Beights would have paid $100,000, whereas the position of Vice President of Air Force Programs offered a salary of $112,000 plus performance bonuses.

[18] "Shift assignment" is not relevant in this case and thus will not be analyzed. Further, the court notes that the "job location" for both positions would have been Pensacola.

[19] In analyzing whether the two positions were of like status, the court refers to the duties of the Vice President of Construction position as they existed at the time of Long's return from his deployment rather than the time of his departure.

Case No.: 3:05cv227/MCR/EMT

argues that the Vice President of Air Force Programs position was a mere marketing job, the evidence shows that both positions entailed marketing responsibilities. Also, it is undisputed that Ellis does not have a marketing department and that all of its employees are expected to engage in marketing. According to Jeffrey Bleke, employees, including Long, "marketed" to companies by performing current projects well. Charna also noted in describing Long's former duties as Vice President of Construction that he was required to market Ellis' qualifications to existing or potential clients.

    Beyond the similar duties of the two positions, the record evidence shows that the Vice President of Air Force Programs position presented greater opportunity for advancement and greater corporate responsibility than the Vice President of Construction position. Ellis originally wanted to make Long a senior vice president, which would have been a higher rank than his former position, and was intended to "denote more authority" in the company. At the time of Ellis' reemployment offer Long would have been the only senior vice president in the company. Further, many of Long's duties as Vice President of Air Force Programs had been performed until that point by Jeffrey Bleke, the company's president. The Vice President of Air Force Programs would direct a growing part of the company's business that Jeffrey Bleke testified carried more potential for career growth and professionalism and had "done more volume in less than six months than the company [had] in ten years." In this position Long would have been responsible for overseeing and managing Ellis' military relationships on Air Force bases across the country. In addition, Long eventually would have been charged with hiring an international arm for the company's Air Force division that would have been responsible to him and through which he would have administered and managed global Air Force projects. Finally, Long would have received $112,000 in base pay as well as a performance-based incentive that could have doubled or tripled his previous income.[20]

    While the Vice President of Air Force Programs position was in a growing area of the company and involved significant corporate responsibility, the evidence shows that the

---

[20] In the first year alone, based on Jeffrey Bleke's performance, in addition to his base salary Long's incentive compensation as Vice President of Air Force Programs would have been $118,500.

Case No.: 3:05cv227/MCR/EMT

position of Vice President of Construction was no longer the same position as it was when Long left for his deployment, having decreased in responsibilities and importance.  When Long held the position there were construction projects in the $4 million range lasting over a year in a number of different cities but after he left Ellis did not continue to have similar projects, other than in Pensacola.  Further, following Long's departure, the company did not believe that the position needed to be filled, but rather divided its duties among Clay Gibson, Jim Beights, James Bleke, and Jeffrey Bleke.  Even when Jim Beights was promoted to Vice President of Construction, his salary was $12,000 less than what Long had earned, and the record does not show that the position provided for performance-based incentives.  Also, the duties of the position decreased commensurate with the downsizing of construction projects.  Further, when Beights left the company nine months later, Ellis again decided that it was unnecessary to fill the position.  While there were a number of large contracts in the Pensacola area (including the MAC contract), Ellis did not believe that it was necessary to fill the position because Clay Gibson was able to handle the additional responsibilities as Regional Manager for Pensacola and there were no large projects outside of Pensacola.

The record also reveals no evidence that the Vice President of Air Force Programs would have had less desirable general working conditions than the Vice President of Construction.  The evidence shows that in the new position Long would have been entitled to a support staff and would have managed many of the people he had previously managed that were now working on Air Force projects.  Jeffrey Bleke stated that Long would have been given "whatever was required to run [the] program, which would have been at Mr. Long's discretion, subject to our approval as a board."  Further, the job description for Vice President of Air Force Programs in the reemployment offer letter lays out the duties and goals of the position.[21]  In addition, the evidence shows that both

---

[21] Long relies on <u>Nichols v. Dep't of Veteran's Affairs</u>, 11 F.3d 160 (Fed. Cir. 1993), and <u>Ryan v. Rush-Presbyterian-St. Luke's Medical Center</u>, 15 F.3d 697 (7th Cir. 1994), for the proposition that the new job was unequal in status because it did not have a support staff or clearly defined goals.
   In <u>Nichols</u>, the plaintiff had accepted a lower status position and was working in that position when he filed his claim and thus he had recent firsthand knowledge and experience regarding the responsibilities of the position.  In this case, Long never inquired (at the April 2005 meeting with the Blekes and Charna or

positions required travel but that Jeffrey Bleke had directed the company's Air Force programs from his office in Gainesville, Florida, for the past ten years without difficulty.[22] Finally, the record shows that Long's use of a company car, 401(k) plan, and health insurance benefits would have been the same in either position. Based on a change in company policy that was instituted after Long left for active duty, no employee was permitted personal use of company cars. The start date for Ellis' 401(k) contributions and health insurance benefits was set by company policy for all positions regardless of the reason for the employee's absence and thus would have started on the same day for either position.

Based on the record presented, the court finds that there are no issues of material fact on Long's claim under § 4312 and that Ellis is entitled to judgment as a matter of law as it offered to reemploy Long in a position of like seniority, status, and pay to the one that Long would have held had he never been called to active duty. Summary judgment on Long's claim under § 4312 is therefore granted.[23]

### B. Section 4311

Because Long's claim under § 4312 fails, his claim of discrimination under § 4311 likewise fails. Even assuming, arguendo, that the court had found that an issue of material

---

otherwise) as to the support staff or goals he would have. Thus his statements about the lack of support staff and the absence of articulated goals are nothing more than speculation. Further, in Nichols the plaintiff was forced to report to the person who replaced him in his old position, which is not the case here. Long formerly reported to Senior Vice President James Bleke while in his new position he would have reported to Jeffrey Bleke, the president of Ellis. Ryan is also distinguishable. In that case, the Seventh Circuit reversed a district court's grant of summary judgment on the ground that the defendant offered the plaintiff the position of assistant nurse manager, when she was previously employed as a nurse manager. Ryan, 15 F.3d at 699. Here, however, Long was formerly employed as a vice president and was offered reemployment as either a senior vice president or vice president.

[22] Long also fails to cite any legal authority that increased travel is a mark of worsened working conditions rather than a mark of increased authority and responsibility in a company. Moreover, in its final offer Ellis agreed to allow Long to direct the Air Force Programs from Pensacola.

[23] The court notes that Ellis also challenged Long's § 4312 claim on the grounds that reemploying Long in his same position or a comparable position would have been "impossible or unreasonable." See 38 U.S.C. § 4312(d)(1)(a). As the court has determined that summary judgment should be granted on Long's claim under § 4312 because Ellis offered reemployment in a position of like seniority, status, and pay, it does not reach the question of whether reemploying Long in the same or a comparable position would have been "impossible or unreasonable."

Case No.: 3:05cv227/MCR/EMT

fact existed as to whether Ellis' offered position was of like seniority, status, and pay, Long's claim under § 4311 nevertheless would fail to survive summary judgment as the record does not reveal any inference of discriminatory intent.

In order for a plaintiff to meet his initial burden under § 4311, he must produce either direct or circumstantial evidence of discrimination based on his military status. Coffman, 411 F.3d at 1238, 1239 (quoting Sheehan, 240 F.3d at 1014). Plaintiff is not required to show that his military status was the sole cause of the adverse action, but rather that "it is one of the factors that 'a truthful employer would list if asked for the reasons for its decision.'" Coffman, 411 F.3d at 1238 (quoting Brandsasse v. City of Suffolk, Va., 72 F.Supp.2d 608, 617 (E.D. Va. 1999)); see also Smith v. School Board of Polk County, Fla., 205 F.Supp.2d 1308, 1314 (M.D. Fla. 2002) (quoting Sanguinetti v. United Parcel Service, Inc., 114 F.Supp.2d 1313, 1318 (S.D. Fla. 2000)). Military status is thus a motivating factor if "'the defendant relied on, took into account, considered, or conditioned its decision on that consideration.'" Id. (quoting Brandsasse, 72 F.Supp.2d at 617); see also Smith, 205 F.Supp.2d at 1314 (quoting Sanguinetti, 114 F.Supp.2d at 1318). The Eleventh Circuit has held that a "court can infer discriminatory motivation under USERRA from a variety of considerations such as":

> (1) proximity in time between employee's military activity and the adverse employment action
> (2) inconsistencies between the proffered reason and other actions of the employer
> (3) employer's expressed hostility toward members protected by the statute together with knowledge of the employee's military activity
> (4) disparate treatment of certain employees compared to other employees with similar work or offenses.

Coffman, 411 F.3d at 1238 (quoting Sheehan, 240 F.3d at 1014)). In analyzing these factors, "all record evidence may be considered, including the agency's explanation for the actions taken." Sheehan, 240 F.3d at 1014; accord Leisek v. Brightwood Corp., 278 F.3d 895, 900 (9th Cir. 2002).

Turning to the first factor cited in Coffman, the court finds no discriminatory intent based on the proximity in time between Long's military service and the alleged adverse

action. While Long argues that Ellis did not send him the reemployment offer letter until the time of his return from active duty, this fact does not create an inference of discriminatory intent. Ellis could not offer Long reemployment until it knew that Long's active duty was ending and that Long sought to reemploy with Ellis.

The court also finds no inference of discriminatory intent based on its consideration of the second factor noted in Coffman, inconsistencies between the proffered reason and other actions of the employer. Ellis maintains that it offered to reemploy Long as Vice President of Air Force Programs because it believed that the position of Vice President of Construction had changed to the extent that, in effect, it was no longer the same job that Long had performed prior to his deployment. The responsibilities of the position of Vice President of Construction – as assigned to and performed by Jim Beights – no longer made the best use of Long's abilities.[24] According to Ellis, the position of Vice President of Air Force Programs would allow Long to perform duties similar to those he had performed in his former position but in an area that was growing quickly in size and scope. Ellis believed that Long was best suited to help the company develop this emerging aspect of its business.

Long disputes Ellis' cited reasons, asserting that he was only offered what was in actuality a program manager position. In addition, Long contends, Ellis had been trying to sell the Air Force segment of the company during his deployment and, after he had denied

---

[24] The position of Vice President of Construction under Jim Beights had fewer responsibilities than those held by Long in the same position. The number of large projects outside of Pensacola, Florida, had decreased and the size and number of projects in Pensacola had increased. Because of this, the importance of the position of Pensacola Regional Manager, Clay Gibson, increased and the importance of the Vice President of Construction decreased such that James Bleke stated in his deposition that the duties of the two positions were roughly equivalent. The decrease in the Vice President of Construction's level of responsibility is further supported by the evidence that it was performed by an individual without certification as a professional engineer, paid $12,000 less than when held by Long, and was performed by an individual that Long agrees was less qualified. In addition, the record shows that the Vice President of Construction position had such decreased importance that the company did not fill the position between August 2004 (when Long left) until February 2005. Then, after Jim Beights left the company in November 2005, Ellis interviewed four or five people, but ultimately decided that there was no need to fill the position. The position remained unfilled as of April 2006, with James Bleke performing many of the duties as part of his position as Executive Vice President. The job of Vice President of Air Force Programs, however, was in an area of the company that had done more volume in six months than the company had performed in the prior ten years, including $77 million in contracts as part of the WERC contract.

Case No.: 3:05cv227/MCR/EMT

Ellis' reemployment offer, eventually novated the Air Force contracts to EWAC. Long therefore argues that Ellis was actually trying to terminate Long's employment with the company. Specifically, Long relies on the fact that he stated to James Bleke shortly after his return from deployment that it sounded as if Ellis did not want him back, a statement to which Bleke did not respond.[25] Long also notes that the position would have been part of the novation of Ellis's Air Force contracts to EWAC[26] and that Ellis promoted Jim Beights to his former position approximately two months before Long notified the company that he would be returning from active duty.

      Long's argument is unpersuasive. As previously discussed, the undisputed record evidence shows that prior to the time the position of Vice President of Air Force Programs was offered to Long, the duties of the position had been performed by Ellis' president, Jeffrey Bleke, as well as Michael Carter. Further, the record suggests that Carter was a Vice President, not a Program Manager. The record also shows that the negotiations with Fluor never advanced beyond the discussion stage and that even if Fluor had bought the Air Force segment of Ellis, Fluor was not required to hire Long and Long was not required to accept the position if offered. As to EWAC, the evidence shows that Long would have had the opportunity to become an employee of EWAC, but that such a change would not be required. Further, the novation of Air Force contracts to EWAC only involved the WERC contract. Although this was a significant contract, it was not Ellis' only Air Force contract and Ellis continued to obtain Air Force contracts under the WERC contract as a sub-contractor. In addition, Long has presented no evidence to refute James Bleke's testimony that Jim Beights was promoted to Vice President of Construction in February 2005 simply because of Ellis' current and back work load and the need for Beights to take on a larger role than his former position as Field Superintendent.

---

[25] Long states that this exchange occurred after he learned of the discussion to sell the part of the company that dealt with Air Force contracts to Fluor and Bleke's recommendation that, if the deal were consummated, Fluor should hire Long.

[26] Long argues that this fact creates an inference of discrimination as the offered position may not have even existed with the company. The undisputed evidence reflects, however, that at the time the offer was made there was a need for the position.

Case No.: 3:05cv227/MCR/EMT

Application of the third factor cited in Coffman, an employer's expressed hostility toward members protected by the statute coupled with knowledge of the employee's military activity, also does not suggest an inference of discriminatory intent by Ellis.[27] While it is clear that Ellis was aware of Long's military status, Long has presented no evidence of hostility by Ellis toward those in the military. To the contrary, the record shows that, upon learning of Long's pending deployment, Ellis offered to pay Long a retention bonus of $2,000 a month. Indeed, Ellis paid Long $16,000 during his deployment in order to encourage him to return to Ellis upon the completion of his military service, even as the company was experiencing financial problems. Long was also able to continue contributing to the company's 401(k) plan and to maintain medical coverage under "COBRA-like" conditions. Further, the record shows that Ellis believed that Long was well-suited for the offered position as Vice President of Air Force Programs precisely because he had "in-country" military experience working on contracts to help rebuild Iraq after the war and had extensive knowledge of government programs.

The fourth factor cited in Coffman, which pertains to the disparate treatment of employees, is not directly relevant to this case as Long was not competing against another individual for the position of Vice President of Air Force Programs. Long alleges that he was treated differently than Jim Beights, who was not currently active duty or reserve status military and who was given the position of Vice President of Construction. Beyond this fact, however, Long was treated equally or better than Beights. Long initially was to be reemployed as a Senior Vice President, while Beights was only a Vice President. Beights was paid only a $100,000 base salary, while Long was offered a base salary of $112,000 with bonus compensation totaling over $118,500 in the first year alone. In addition, both positions had similar duties and had Regional and Project Managers reporting to them. Accordingly, this factor also does not create an inference of discriminatory intent.

Having analyzed the four Coffman factors, the court concludes that Long has failed to satisfy his initial burden under § 4311 of showing some evidence that his military service

---

[27] Long does not address this factor in his response.

Case No.: 3:05cv227/MCR/EMT

was a substantial or motivating factor in Ellis' employment decision.  Accordingly, Ellis is entitled to summary judgment on this claim.  Even if, however, the court had determined that Long had met his burden under § 4311, this claim would still fail because the court is satisfied that, based on the undisputed record, Ellis has successfully established an affirmative defense.[28]

Ellis argues that changes in the nature and quantity of its government contracts during Long's deployment necessitated a reorganization of Ellis' management and thus that the company would have taken the same employment action regarding Long regardless of his military service.  Long rejects Ellis' contention, arguing that Jim Beights was already working as the Vice President of Construction when Long returned from Iraq; moreover, Long maintains, after Jim Beights left to take a job with EWAC, Ellis continued to advertise for a Vice President of Construction on its website.

Ellis does not contest that Jim Beights held the title of Vice President of Construction or that it continued to advertise for a Vice President of Construction after Beights left.  Nevertheless, the undisputed evidence supports that while the position of Vice President of Construction continued to exist in name the responsibilities of that position had substantially changed during Long's deployment.  Because of these changes the role of the Vice President of Construction was no longer as important.  While the size and number of projects in Pensacola had expanded, the Regional Manager for Pensacola, Clay Gibson, was able to handle this added responsibility.  Furthermore, beyond the contracts in Pensacola there were few large, non-Air Force construction contracts.  Accordingly, there was less need for a Vice President of Construction and fewer duties attached to the position.  Thus, as Ellis maintains, if Long had been reemployed as Vice President of Construction he would have been in a position with less authority and fewer responsibilities

---

[28] The Second Circuit has noted that the forms of analysis for dual motivation and pretext cases of employment discrimination are different, though "it is possible to analyze all motivation cases . . . using only the dual motivation approach." Holo-Krome Co., 954 F.2d at 111.  The Holo-Krome court also noted that "when dual motivation analysis is used, pretext inquiry is avoided in those cases where the defendant fails to sustain its affirmative defense, but in those cases where the defendant sustains its burden,  the fact-finder will have implicitly applied pretext analysis and found that the employer's articulated reason for its action was not pretextual." Id., n.1.  Thus for purposes of analysis in the instant case, in which the court concludes that Ellis has sustained its burden, the distinction between dual motivation and pretext cases is immaterial.

(and potentially less pay). Rather than offering such a position to Long, Ellis instead reasonably sought to reemploy Long in a position better suited to his abilities and seniority in the company. Finally, while Ellis may have continued to advertise for a Vice President of Construction, Long has presented no evidence to refute Ellis' contention that the position has not been filled because Ellis does not have a need to fill it.

**Conclusion**

Plaintiff has failed to show that he was not offered reemployment in a position of like seniority, status, and pay; that defendant's decision not to reemploy him as Vice President of Construction was motivated by discriminatory intent; and that Ellis would not have taken the same action regardless of Long's military status. Ellis is therefore entitled to summary judgment on Long's claims under § 4312 and § 4311 of USERRA.

Accordingly, it is ORDERED:

1. The motion for summary judgment filed by defendant Ellis Environmental Group, LC, (doc. 33) is GRANTED and plaintiff Darryl D. Long's claims are DISMISSED with prejudice.

2. Consistent with this order, the clerk of court is directed to enter summary judgment in favor of defendant Ellis Environment Group, LC. Plaintiff Long shall take nothing further by this action and hence goes without day.

**DONE and ORDERED** this 30th day of March, 2007.

*s/ M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**